# BLOCK HOUR CHARTER AGREEMENT

THIS AGREEMENT, made and entered into this 1st day of October, 2006, by and between Century Jets, L.L.C., a Delaware Limited Liability Company with its principal place of business at 3028 Travis Pond Road, Williamsburg, Virginia 23185 (hereinafter referred to as "Charter Operator"), and Forest City Enterprises, Inc., with its principal place of business at 50 Public Square, Suite 1100, Cleveland, Ohio, 44113 (hereinafter referred to as "Charterer").

## WITNESSETH:

WHEREAS, Charter Operator has available under contract for Charterer's non-exclusive use an aircraft (hereinafter collectively referred to as "the "Aircraft" which shall be more particularly described in Attachment 1 hereto) and suitable for Charterer's purposes; and

WHEREAS, Charterer desires to charter the Aircraft from Charter Operator and to secure through Charter Operator the flying services thereof, upon the terms and conditions hereinafter set forth in this Agreement;

NOW, THEREFORE, for and in consideration of the mutual covenants and agreements hereinafter contained, the parties do hereby agree as follows:

1.  Aircraft.  Charter Operator agrees to make the Aircraft available for the non-exclusive use of Charterer, upon the terms and conditions more particularly set forth in this Agreement. There shall be no limit to the number of aircraft that the Charterer may charter simultaneously.

2.  Term; Termination.  The Term of this Agreement shall commence on the date set forth above and shall continue for a period of one (1) year, or Charterer's consumption of all Allocated Hours, whichever shall first occur, AND THEREAFTER for four (4) successive, additional one (1) year terms (each a "Renewal Term") for an additional 300 hours per Renewal Term under these same terms and conditions, however,  the Contract Rate under 3(a) will be adjusted by the Consumer Price Index (CPI-U, U.S. City Average for All Items, 84=100) for each Renewal Term.

    This Agreement may be terminated prior to its expiration with the mutual consent of the parties. In such event any unearned advance deposits or payments shall be refunded to Charterer from the escrow account.

3.  Contract Rate; Usage.

    (a)  Charterer agrees to pay for and Charter Operator agrees to furnish to Charterer a guaranteed block of 300 hours of Aircraft flight time(the "Allocated Hours")  during the Term and each Renewal Term of this Agreement and Charterer agrees to pay to Charter Operator the amount of $2650.00/ hour for each hour utilized under the JetCard rate and $2200.00/ hour for each hour utilized under the Round Trip Charter Rate, (the "Contract Rate") for said block of Allocated Hours, in accordance with the provisions of Section 4, below.

(b)  Charterer shall utilize the Aircraft only for and on account of his/her own pleasure or business in the carriage of his/her officials, employees and/or guests, and will not use the Aircraft for the purpose of providing air transportation of passengers or cargo for compensation or hire, except in accordance with the provisions of the applicable Federal Aviation Regulations.

(c)  Charter Operator shall make available a qualified and FAA-approved crew consisting of two (2) pilots (and when required by regulations, a cabin crew) qualified and current in the Aircraft, who shall operate the Aircraft in accordance with Federal Aviation Regulations and Charter Operator's insurance requirements. Charterer may approve Charter Operator's choice for Primary Aircraft listed in Attachment 1, and Charter Operator's primary assigned aircrew for this Aircraft, to the extent permitted by the Federal Aviation Regulations. Charter Operator will grant Charterer full access to its office facility (phone/fax/internet/meetings) at Cleveland Burke Lake Airport (BKL).

4.  <u>Payments</u>.

(a)  Upon execution of this Agreement Charterer shall deposit Two Hundred Sixty Five Thousand Dollars ($265,000.00) to the escrow account described below to be used to pay the contract rate and amounts due Charter Operator under paragraph 3(a) above, and Charterer shall pay all other additional sums in the manner set forth in this Section 4, and shall make additional Two Hundred Sixty Five Thousand Dollar ($265,000.00) deposits to the escrow account on the fourth and eighth month anniversaries of the execution date. Payments during any Renewal Term shall be made in the same manner as in the preceding sentence. If Charterer's account balance falls below $20,000 before the fourth month or eighth month anniversaries then, upon receipt of notice by Charterer from Charter Operator, the Charterer shall deposit the next Two Hundred Sixty Five Thousand Dollar ($265,000.00) payment to the escrow account at that time. At the conclusion of the Term and each Renewal Term a reconciliation of the escrow account will be conducted within 10 calendar days. Subsequently, any amounts due Charter Operator shall be paid by Charterer within 15 calendar days and/or any excess amounts contained in the escrow account due Charterer shall be refunded to Charterer within 15 calendar days.

(b)  The Charterer's payments shall be held in a third party escrow account by National City Bank of the Midwest, and the account shall be debited after each charter flight. Debited flight hours for all JetCard charter trips will be calculated with all Aircraft departing from Home Base and /or returning to Home Base. Debited flight hours for all Round Trip charter trips will be calculated with all Aircraft departing from Home Base AND returning to Home Base. Home Base for purpose of this agreement shall be Cuyahoga County (CGF), Burke Lakefront (BKL) or Hopkins (CLE). Debited flight hours for all charter trips will be based upon actual flight time, plus twelve (12) minutes per flight segment. A two (2) flight hour per day aircraft minimum utilization charge (cumulative for the charter trip) shall apply ONLY for multi-day Round Trip charter trips. Debited flight hours for cancelled charter trips shall apply. (See Attachment 5).

(c)     Trip segments shall apply only to the continental United States and the Caribbean Islands. Reposition charges apply for flight segments to the Caribbean Islands, and shall be charged to/from the nearest US point of entry (customs) in the continental United States, at the program rates, for flight segments that terminate or originate in the Caribbean Islands.

(d)     All payments due Charter Operator under this Agreement shall be made payable to Charter Operator and paid by wire transfer in U.S. Dollars from the escrow account to Charter Operator's bank account as follows, within five (5) business days of receipt of Charter Operator's invoice:

| | |
|---|---|
| Bank Name: | Bank of America |
| Bank Address: | 12350 Jefferson Avenue, Suite 270 |
| | Newport News, Virginia 23602-6900 |
| ABA Routing Number: | 0260-0959-3 |
| Account Name: | Century Jets, L.L.C. |
| Account Number: | 004353158427 |
| Attention: | Janet Barkley, Business Banking |

(d)     Charterer agrees to pay for all other Aircraft-related costs as set forth in Attachment 2 and in the manner described in this Section 4, as well as the overnight crew expenses set forth in Attachment 2 whenever the Aircraft remains overnight on multi-segment or Round Trip charter trips.

(e)     Charterer agrees to be governed by the cancellation policy as set forth in Attachment 5, and pay all associated fees and charges in the manner set forth in this Section 4.

Maintenance, Insurance, Service.

(a)     Charter Operator covenants that the Aircraft shall be kept clean and maintained in a good and airworthy condition in full compliance with Parts 43 and 135 of the Federal Aviation Regulations.

(b)     Charter Operator covenants that the Aircraft and the operations contemplated herein shall be insured by an aviation liability insurance policy in an amount not less than Fifty Million Dollars ($50,000,000) per occurrence, which shall encompass property damage and bodily injury liability insurance, including passenger bodily injury liability insurance.

(c)     Charter Operator and Charterer covenant and agree that neither will do any act whereby the insurance shall or may be suspended, impaired or defeated.

(d)     Charter Operator shall furnish to Charterer a certificate of insurance from the Global aviation insurance company which includes the coverage set forth herein, and naming Charterer as additional named insured on the policy.

(e)     Service by Charter Operator shall at all times conform to industry standards. Charter Operator further covenants that it shall maintain its operator certificate, and it shall incur no FAA violations.

Operational Control.  It is understood and agreed that the operation of the Aircraft during charter

flights shall at all times be for the sole benefit of Charterer or its designated agents, however, operational control shall be vested solely in the Aircraft operator. The Aircraft operator shall have the sole discretion as to safety of flight and other Aircraft operational matters, and may cancel or divert any flight(s) because of adverse flying conditions, or mechanical malfunction(s) of the Aircraft. In the event of such a flight cancellation or diversion, Charter Operator shall arrange alternate air transportation to Charterer's intended destination at no additional cost to Charterer, or at the option of the Charterer, the Charter Operator shall not debit the Charterer's account or charge a cancellation charge for the cancelled flight.

7.  Non-exclusive Use; Substitute Aircraft. It is understood and agreed between the parties that the Aircraft hired hereunder and the flying services to be furnished in connection herewith are to be furnished to Charterer on a non-exclusive basis. If the Aircraft is unavailable for any reason, Charter Operator reserves the right to substitute an aircraft comparable to or of a higher class than the Aircraft (which for purposes of that flight(s) will be deemed the Aircraft). Attachment 3 lists "comparable" aircraft which can be used. Charter Operator represents and warrants that it currently has and for the Term of this Agreement shall maintain sufficient and suitable aircraft under contract which shall be available to permit Charter Operator to fulfill its obligations hereunder.

8.  Interchange. While it is the present intention of Charterer to purchase a block of time to be utilized on the Aircraft, Charterer may, from time to time, need or want to utilize a different aircraft (the "Interchange Aircraft"). Charterer may, upon notice to Charter Operator and subject to aircraft availability, apply its Allocated Hours to charter the Interchange Aircraft in accordance with the terms and conditions of this Agreement, substituting the Interchange Aircraft for the Aircraft. Charter Operator shall utilize its best efforts to make the specifically requested Interchange Aircraft available upon Charterer's request, but shall suffer no penalty for its inability to do so.

9.  Charge for Use of Interchange Aircraft. No additional charge shall be made for the use of an Interchange Aircraft, unless an Interchange Aircraft of a different make or model than the Aircraft is used. In such event, the charge for the Interchange Aircraft shall be based upon the Interchange Ratios set forth in Attachment 4 hereof (which itself is subject to change from time to time upon prior notice to Charterer), and shall be debited or credited against the balance of Charterer's unused Allocated Hours.

10.  Unused Flight Hours. In the event there are any unused Allocated Hours remaining in Charterer's account at the end of the term or any Renewal Term, Charterer shall be given an automatic 30 day extension period within which to use the Allocated Hours. Thereafter any remaining unused Allocated Hours shall be forfeited unless the Agreement is renewed whereupon the unused hours shall be transferred to the Renewal Term.

11.  Indemnification.

(a) The Charter Operator shall indemnify and hold Charterer harmless from and against any loss,

Section 5 arising out of any negligent act or omission to act on the part of Charter Operator
or Aircraft Operator, their agents, or employees, provided, however, that this limitation as to
the amount of available insurance proceeds shall not apply if damage or loss is caused by
gross negligence or willful misconduct, and provided further, that except as otherwise
provided herein, neither Charter Operator nor Aircraft Operator shall be liable to Charterer
for any loss, damage or delay resulting from any cause which is beyond the control of
Charter Operator or Aircraft Operator or from agents or employees, including, but not
limited to, delay caused wholly or in part by adverse weather or to unforeseen mechanical
malfunction of the Aircraft which was not caused by maintenance of the Aircraft provided
by the Charter Operator or Aircraft Operator or their agents or employees.

    (b)    Each party shall indemnify, protect, defend and hold harmless the other party, its directors,
officers, agents, servants, guests and employees from and against any and all loss, cost,
damage, injury or expense that my be incurred by reason of any breach of any representations
by such party set forth in this Agreement. It is specifically agreed and understood that
neither party shall be liable for the indemnification of (a) indirect, special, punitive and/or
consequential damages suffered by the other party, and/or (b) losses, costs, damages, injuries
or expenses arising out of the other party's gross negligence and/or willful misconduct.

12.    Assignment.    This Agreement shall not be assignable by Charterer without the prior written
consent of Charter Operator, which consent shall not be unreasonably withheld. The preceding
sentence shall not prohibit Charter Operator from utilizing aircraft from any other source. Any
permitted assignee must comply with all terms and conditions of this Agreement and the Federal
Aviation Regulations.

13.    Default.    The (a) failure of either party to perform or observe (or cause to be performed or
observed) any covenant or agreement to be performed or observed by it under this Agreement, or
(b) if any representation or warranty made by either party or any document or certificate furnished
by a party pursuant hereto shall prove to have been incorrect in any material respect at the time
made and shall remain incorrect at the time in question, or (c) the commencement of a bankruptcy
proceeding in respect of either party, or (d) the consent by a party to the appointment of or taking
possession by a receiver, liquidator, assignee, trustee or custodian (or similar official) of all or
substantially all of a party's property, or (e) the making of any assignment for the benefit of
creditors by either party, or (f) the failure of the Charter Operator to remain financially solvent,
shall be deemed an event of default.

14.    Remedies.    Upon the event of any default and at any time thereafter, so long as such event of
default shall not have been cured or remedied within thirty (30) days, the non-defaulting party
may, at its option, declare the defaulting party to be in default and, at any time thereafter so long
as such event of default shall be continuing, may take any action at law or in as the non-defaulting
party in its sole discretion shall elect, to the extent permitted by, and subject to compliance with
any mandatory requirements of, applicable law then in effect including, but not limited to, filing
suit for specific performance and/or terminating this Agreement and canceling the continuing

obligations of the non-defaulting party. In addition, in the event of a default by the Charter Operator, Charterer shall have the right to demand and receive funds remaining on deposit in the escrow account.

15.   Miscellaneous.

   (a)   ***Survival***.  The representations, warranties, covenants, and obligations of the parties made herein shall survive the execution, delivery and termination of this Agreement and consummation of the transactions described herein.

   (b)   ***Governing Law***.  This Agreement shall be interpreted and governed by the laws of the State of Virginia.

   (c)   ***Counterparts***.  This Agreement may be executed in one or more identical counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same agreement.

   (d)   ***Entire Agreement***.  This Agreement and Attachments 1 through 5 constitute the entire understanding between the parties and there are no representations, warranties, conditions, covenants or agreements other than as set forth expressly herein.

   (e)   ***Severability***.  Any provision of this Agreement which is unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition; however, such unenforceability in any such jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  The unenforceable provision shall be replaced by a provision mutually acceptable to Charterer and Charter Operator, which, being valid, legal and enforceable comes closest to the intention of the parties' underlying the unenforceable provision.

   (f)   ***Relationship of Parties***.  Nothing contained herein shall be deemed to constitute a partnership or joint venture or any business organization of any kind among the parties hereto or among any of the owners of interests in the Aircraft or any other Interchange Aircraft.

   (g)   ***Waiver***.  The failure of either party to insist on strict performance of any of the agreements, terms, representations, warranties, covenants and conditions hereof shall not be deemed a waiver of any rights or remedies that a party may have for any subsequent breach, default, or non-performance by the other party, and the waiving party's right to insist on strict performance of this Agreement shall not be affected by any previous waiver or course of dealing.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers, the day and year first above-written.

CHARTER OPERATOR:                     CHARTERER:

CENTURYJETS, L.L.C.                   FOREST CITY ENTERPRISES, INC.

By _____        By: _____
        Charles V. Sonson                      Albert Ratner


Title: _____MEMBER_____               Title: _____


Attachments

Case 1:07-cv-02402-BMC-RML   Document 4    Filed 06/27/07   Page 8 of 12

## DESCRIPTION OF AIRCRAFT

### BEECHJET 400A (TBD) Primary Aircraft

*** Guaranteed Availability – Twenty Four (24) Hour minimum advance notice is required for guaranteed availability of primary Aircraft or substitute. Any itinerary change or departure time change of greater than two (2) hours after a charter request is made will reset the twenty four hour advance notice requirement for guaranteed availability, and the change will be treated as a new request.

## AIRCRAFT-RELATED COSTS

Aircraft-related costs include the following, and will be charged separately at the following rates:

### *Domestic Flights:*

| | |
|---|---|
| • Flight phone | Actual Cost |
| • Landing/Parking Fees | Actual Cost |
| • De-Ice Fees | Actual Cost |
| • Catering (other than standard stock) | Actual Cost |
| • Flight attendant (if requested, but not required) | $400.00 per day |
| • Crew overnight expenses (multi day charter) | $300.00 per crew member per day |
| • Fuel surcharge | Actual in excess of $2.50 per gallon |
| • Excise taxes | Government Rate |

### *International Flights:*

| | |
|---|---|
| • Customs fees | Actual Cost |
| • Flight Phone | Actual Cost |
| • Immigration and naturalization inspections/fees (if any) | Actual Cost |
| • Agricultural inspections fees (if any) | Actual Cost |
| • Dispatch | Actual Cost |
| • Fuel surcharge | Actual in excess of $2.50 per gallon |
| • Landing/Parking Fees | Actual Cost |
| • De-Ice Fees | Actual Cost |
| • Flight following | Actual Cost |
| • Overflight fees | Actual Cost |
| • Flight attendant (if requested, but not required) | $400.00 per day |

## ATTACHMENT 3

## LISTING OF COMPARABLE AIRCRAFT

Beechjet 400A (Other than Primary Aircraft)

Citation V / Ultra / II /Bravo

Gulfstream 100

Westwind

Lear 31 / 45

Raytheon Premier

-10-

## INTERCHANGE RATIOS

| | |
|---|---|
| Challenger 601 | 1.70 : 1 |
| Falcon 50 | 1.65 : 1 |
| Falcon 900 | 2.21 : 1 |
| Gulfstream IV | 2.21 : 1 |
| Gulfstream III | 1.70 : 1 |

## CANCELLATION CHARGES

If Charterer cancels a charter trip after receiving a confirmation from Charter Operator:

- Charterer shall be assessed no penalty if such cancellation notification is received by Charter Operator more than 24 hours prior to scheduled departure time/date.

- Charterer will be debited two (2) Flight Hours for the charter trip if cancellation notification is received less than 24 hours prior to scheduled departure time/date.

- Charterer will be debited 100% of the total estimated Flight Hours for the charter trip if cancellation notification is received after the aircraft to be used on the trip departs to operate the trip.

- Charterer agrees to pay all additional aircraft related costs set forth in Attachment 2, incurred on any charter trips cancelled by Charterer with less than 24 hours advance notice.